**REDACTED OPINION**

# In the United States Court of Federal Claims

**No. 08-450C**
**Filed: August 25, 2008**
**Redacted Version Issued for Publication: September 9, 2008**[1]

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | | |
| **CAREER TRAINING CONCEPTS, INC.,** | * | **Post-Award Bid Protest; Injunctive Relief; Untimely Proposal; FAR Subpart 8.4, Federal Supply Schedules (FSS) versus FAR Part 15, Negotiated Procurement; FSS Labor Category; Discussions versus Clarifications; Evaluation of Proposals; Disqualification of Offeror.** |
| **Plaintiff,** | * | |
| **v.** | * | |
| **UNITED STATES,** | * | |
| **Defendant.** | * | |
| * * * * * * * * * * * * * * | * | |

**Bryant S. Banes**, Neel, Hooper & Banes, PC, Houston, TX, for the plaintiff. Of counsel, **Sean D. Forbes**, Neel, Hooper & Banes, PC, Houston, TX.

**Russell A. Shultis**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With the attorney of record were **Gregory A. Katsas**, Assistant Attorney General, **Jeanne E. Davidson**, Director and **Kenneth M. Dintzer**, Assistant Director, Commercial Litigation Branch. Of counsel, **Major William J. Nelson**, United States Army Legal Services Agency, Arlington, VA.

## O P I N I O N

**HORN, J.**

## FINDINGS OF FACT

[1] This opinion was issued under seal on August 25, 2008. The parties proposed redactions to the opinion, which were incorporated into this version, and reflected in the text of the opinion with "[deleted]."

Plaintiff Career Training Concepts, Inc. (CTC) protests the award of a General Services Administration (GSA) contract award to Management Training Consultants, Inc. (MTCI) pursuant to Request for Proposals (RFP) no. W9133L-08-R-0014. The RFP was sent to potential offerors via the GSA e-Buy website under Request for Quotation (RFQ) No. RFQ261443. Modifications to the solicitation also were made via the GSA e-Buy website under RFQ No. 261443.[2] The solicitation was issued by the Army National Guard Bureau, for the Education Liaison Program (ELP), which provides recruiting services at high schools and colleges.

Plaintiff seeks a temporary restraining order, preliminary and permanent injunctive relief to terminate the award of the contract at issue with MTCI, to disqualify MTCI from further awards under the solicitation; the grant of plaintiff's motion for judgment upon the administrative record and the denial of defendant's cross-motion; and for the court either to direct the agency to award the procurement to CTC or direct a resolicitation of the procurement. At the first hearing on the bid protest, defendant advised the court that the needed Education Liaison Program services were being performed on a bridge contract by the incumbent, Mind & Media, with plaintiff CTC as a subcontractor on the bridge contract. The bridge contract was to expire on August 6, 2008, at which point the agency intended to issue a Notice to Proceed to awardee MTCI. MTCI did not intervene in this bid protest.

Mindful of the expiration of the bridge contract on August 6, 2008, after review of the administrative record and the briefs filed by the parties, the court issued a bench ruling on that date. A transcript of the hearing was made by a court reporter. This written opinion is provided to memorialize the court's bench ruling of August 6, 2008 and to direct judgment in the case. The bench ruling denied plaintiff's motions for any form of injunctive relief on all issues except the disqualification issue. On the disqualification issue the court denied the plaintiff's motion for a temporary restraining order or preliminary injunction, but indicated that it believed the plaintiff had little likelihood of success on the merits on the disqualification issue. The government, therefore, was permitted to proceed on its award to MTCI. At the oral argument, plaintiff attempted to introduce newly developed material for presentation to the court which contained a new analysis of the disqualification issue not previously included in plaintiff's filings with the court or shared with the defendant, which the court did not allow. At the bench ruling on August 6, 2008, the court, however, offered

---

[2] The terminology used throughout the procurement process, and, consequently, by the parties in their presentations to the court, was sometimes confusing. For example, terms such as "RFP" and "RFQ" were interchanged. In addition, what defendant describes as a GSA Federal Supply Schedules buy appeared to have limited elements of a negotiated procurement. Therefore, in order to avoid using multiple terms to describe the same event or entity and thereby generating even more confusion, unless addressing a specific document in the record, in discussing the issues, the court will use the generic term "solicitation," and also will use terms such as "bid protest," "offeror," and "proposal" as generic terms, not terms of art, even when addressing the GSA e-Buy system and the RFQ at issue.

the plaintiff an opportunity to present this new material in filings on a permanent injunction, if it chose to do so. The court afforded plaintiff's counsel the opportunity to confer with his client to decide whether to proceed with the single issue of MTCI's disqualification in the context of a request for a permanent injunction. On August 15, 2008, CTC formally advised the court that it chose not to proceed and withdrew the disqualification issue and its request for a permanent injunction. In this opinion, therefore, the court denies all forms of injunctive relief requested by the plaintiff in this case.

At the conclusion of the hearing at which the court issued its bench ruling, plaintiff also advised that it wished to file a motion for partial reconsideration on the court's denial of a preliminary injunction, focusing on the single issue of the GSA Federal Supply Schedules labor category for Education Liaison. Later that same day, August 6, 2008, CTC filed its motion, to which defendant was asked to and did respond. Plaintiff's motion for partial reconsideration, which is denied, will be addressed below in the section on the FSS labor categories.

**DISCUSSION**

Injunctive Relief

CTC seeks preliminary and permanent injunctive relief. As a general rule, courts should interfere with the government procurement process "only in extremely limited circumstances." Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 380 (2003) (quoting CACI, Inc.-Fed. v. United States, 719 F.2d at 1581) (quoting United States v. John C. Grimberg Co., 702 F.2d 1362, 1372 (Fed. Cir. 1983))), aff'd, 365 F.3d 1345 (Fed. Cir. 2004); see also Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1556, 1568 (Fed. Cir.) (finding a preliminary injunction to be a "drastic and extraordinary remedy that is not to be routinely granted"), reh'g denied, en banc suggestion declined (Fed. Cir. 1993), cert. denied, 510 U.S. 1092 (1994); Mantech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. at 64 (emphasizing that injunctive relief is not routinely granted) (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)).

The decision on whether or not to grant an injunction is within the sound discretion of the trial court. See FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); Asociacion Colombiana de Exportadores de Flores v. United States, 916 F.2d 1571, 1578 (Fed. Cir. 1990). Confirming the difficult nature of obtaining injunctive relief in a bid protest case, the United States Court of Appeals for the Federal Circuit has stated that even if a trial court finds that the government's actions in soliciting and awarding a contract were arbitrary, capricious, or not in accordance with law, the trial court retains discretion on whether to issue an injunction. See PGBA, LLC v. United States, 389 F.3d 1219, 1225-26 (Fed. Cir. 2004) (finding that the statutory scheme for reviewing procurement decision "does not deprive a court of its equitable discretion in deciding whether injunctive relief is appropriate," and that 28 U.S.C. § 1491(b)(4) "does not automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award."). Once injunctive relief is denied, "the movant faces a heavy burden of showing that the trial court abused

its discretion, committed an error of law, or seriously misjudged the evidence." FMC Corp. v. United States, 3 F.3d at 427.

To obtain a temporary restraining order or preliminary injunction, the plaintiff must carry the burden of establishing entitlement to extraordinary relief based on the following factors:

> (1) immediate and irreparable injury to the movant; (2) the movant's likelihood of success on the merits; (3) the public interest; and (4) the balance of hardship on all the parties.

U.S. Ass'n of Imps. of Textiles and Apparel v. United States, 413 F.3d 1344, 1346 (Fed. Cir. 2005) (citing Zenith Radio Corp. v. United States, 710 F.2d 806, 809 (Fed. Cir. 1983)); see also Pharmaceutical Research and Mfrs. of Am. v. Walsh, 538 U.S. 644, 670 (2003) (requiring a movant for preliminary injunction to prove that the "probability of success on the merits of its claims . . . the risk of irreparable harm, the balance of the equities, and the public interest" weigh in the movant's favor); Somerset Pharms., Inc. v. Dudas, 500 F.3d 1344, 1346 (Fed. Cir. 2007) ("To establish entitlement to a preliminary injunction a movant must establish a reasonable likelihood of success on the merits.") (citing Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd., 357 F.3d at 1325); Seaborn Health Care, Inc. v. United States, 55 Fed. Cl. 520, 523-24 (2003); OAO Corp. v. United States, 49 Fed. Cl. 478, 480 (2001) ("When deciding if a TRO [temporary restraining order] is appropriate in a particular case, a court uses the same four-part test applied to motions for a preliminary injunction," while highlighting that a preliminary injunction must not be granted unless the movant persuades through clear evidence. (quoting W & D Ships Deck Works, Inc. v. United States, 39 Fed. Cl. 638, 647 (1997))); Dynacs Eng'g Co. v. United States, 48 Fed. Cl. at 616.

There is some disagreement on the standard of proof required for injunctive relief, with some Court of Federal Claims opinions citing a preponderance of the evidence and others citing clear and convincing evidence as the test. See Textron, Inc. v. United States, 74 Fed. Cl. at 287 (reviewing both lines of cases and concluding that the standard is a preponderance of the evidence); Bannum, Inc. v. United States, 60 Fed. Cl. 718, 723-24 (2004) (the same judge reviewing both lines of cases and concluding that the standard is a preponderance of the evidence). In Price v. Symsek, the United States Court of Appeals for the Federal Circuit wrote:

> Three standards of proof are generally recognized, ranging from the "preponderance of the evidence" standard employed in most civil cases, to the "clear and convincing" standard reserved to protect particularly important interests in a limited number of civil cases, to the requirement that guilt be proved "beyond a reasonable doubt" in a criminal prosecution.

Price v. Symsek, 988 F.2d 1187, 1191 (Fed. Cir. 1993) (citations omitted).

"Clear and convincing evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is '*highly probable*.'" Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002) (quoting Price v. Symsek, 988 F.2d at 1191) (emphasis in original)). An argument might be made that "highly probable" evidence is consistent with injunctive relief, described by the Federal Circuit as "a drastic and extraordinary remedy that is not to be routinely granted." Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd., 357 F.3d 1319, 1324 (Fed. Cir.) (quoting Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993)), reh'g and reh'g en banc denied (Fed. Cir. 2004). However, no definitive, binding precedent has been found in the context of injunctive relief, whereas the Federal Circuit has explicitly identified other areas of the law such as in cases alleging bad faith, in which the clear and convincing standard is to be used. See, e.g., Am-Pro Protective Agency v. United States, 281 F.3d at 1239-40; Price v. Symsek, 988 F.2d at 1191.

On reflection, this court believes the proper standard is the preponderance of the evidence standard for injunctive relief, or demonstration of a fact as "more likely than not." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2513 (2007) (citing Herman & MacLean v. Huddleston, 459 U.S. 375, 390 (1983)). Utilizing the easier to prove, prevalent in civil cases, standard of proof of a preponderance of the evidence is more user friendly to the parties and furthers the public policy goal of open, accessible and fair government procurement in which each offeror becomes a participant and ombudsman to ensure those goals.

Plaintiff also seeks permanent injunctive relief. The test for a permanent injunction is almost identical to that for a temporary restraining order or preliminary injunction, but rather than the likelihood of success on the merits, a permanent injunction requires actual success on the merits. See Amoco Prod. Co. v. Vill. of Gambill, Alaska, 480 U.S. 531, 546 n.12 (1987) (holding that the standard for permanent injunction is the same as that for preliminary injunction, with the one exception being that the plaintiff must show actual success on the merits, rather than likelihood of success). In PGBA, LLC v. United States, the Federal Circuit set out the test for a permanent injunction, stating that a court must consider:

> (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

PGBA, LLC v. United States, 389 F.3d at 1228-29 (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. at 546 n.12); see also Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd., 357 F.3d at 1325 (finding that a plaintiff who cannot demonstrate actual success on the merits cannot prevail on its motion for permanent injunctive relief); PHT Supply

Corp. v. United States, 71 Fed. Cl. at 12; Int'l Res. Recovery, Inc. v. United States, 64 Fed. Cl. 150, 159 (2005); Hunt Bldg. Co., Ltd. v. United States, 61 Fed. Cl. 243, 279, opinion modified, 63 Fed. Cl. 141 (2004); Bean Stuyvesant, L.L.C. v. United States, 48 Fed. Cl. 303, 320-21 (2000) (citing Hawpe Constr., Inc. v. United States, 46 Fed. Cl. 571, 582 (2000), aff'd, 10 F. App'x 957 (Fed. Cir. 2001)); ATA Defense Indus., Inc. v. United States, 38 Fed. Cl. 489, 505 n.10 (1997) ("'The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.'" (quoting Amoco Prod. Co. v. Village of Gambell, 480 U.S. at 546 n.12)).

Standard of Review

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)-(4) (2000)), amended the Tucker Act, providing the United States Court of Federal Claims with post-award bid protest jurisdiction, and providing a statutory basis for its pre-award bid protests. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001). The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970) and the line of cases following that decision. See, e.g., Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir.) (citing Scanwell for its reasoning that "suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law."), reh'g denied (Fed. Cir. 2004); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003).

Agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D) (2000)[3]; see also

---

[3] The full language of section 706 of the APA provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
> (1) compel agency action unlawfully withheld or unreasonably delayed; and

Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("[T]he inquiry is whether the [government's] procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A) (2000))); Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). In discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit specifically addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706. See Impresa Contruzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5; see also NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (citations omitted); Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1350 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000))); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000).").

---

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law;
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

In Impresa Construzioni Geom. Domenico Garufi v. United States, the court wrote:

> Under the APA standards that are applied in the Scanwell line of cases, a bid award may be set aside if either: (1) [T]he procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure. . . . When a challenge is brought on the first ground, the courts have recognized that contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them" in the procurement process. Latecoere Int'l, Inc. v. United States Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994). Accordingly, the test for reviewing courts is to determine whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," id., and the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C. Cir. 1994). When a challenge is brought on the second ground, the disappointed bidder must show "a clear and prejudicial violation of applicable statutes or regulations." Kentron [Hawaii, Ltd. v. Warner,] 480 F.2d [1166,] 1169 [(D.C. Cir. 1973)]; Latecoere, 19 F.3d at 1356.

Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33 (selected citations omitted); see also Banknote Corp. of Am. v. United States, 365 F.3d at 1351; OMV Med., Inc. v. United States, 219 F.3d 1337, 1343 (Fed. Cir. 2000).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995-96 (Fed. Cir. 1996); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 222 F. App'x 996 (Fed. Cir.), 223 F. App'x 974 (Fed. Cir. 2007); Labat-Andersen Inc. v. United States, 50 Fed. Cl. 99, 106 (2001); Emery Worldwide Airlines, Inc. v. United States, 49 Fed. Cl. 211, 222, aff'd, 264 F.3d 1071 (Fed. Cir. 2001); Dynacs Eng'g Co. v. United States, 48 Fed. Cl. 614, 619 (2001); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 392 (1999), appeal dismissed, 6 F. App'x 867 (Fed. Cir. 2001).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> The agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); see also In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("The agency must present a full and reasoned explanation of its decision . . . . The reviewing court is

thus enabled to perform a meaningful review . . . . "), aff'd on subsequent apppeal, 262 F. App'x 275 (Fed. Cir. 2008); Textron, Inc. v. United States, 74 Fed. Cl. at 285-86.

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency."). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)); see also Seaborn Health Care, Inc. v. United States, 55 Fed. Cl. 520, 523 (2003) (quoting Honeywell, Inc. v. United States, 870 F.2d at 648 (quoting M. Steinthal & Co. v. Seamans, 455 F.2d at 1301)).

As stated by the United States Supreme Court:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (citations omitted); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. ITC, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion otherwise not in accordance with the law" standard, the Federal Circuit stated that "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang-Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. United States, 4 F.3d 955, 959 (Fed. Cir. 1993); Gulf Group Inc. v. United States, 61 Fed. Cl. 338, 351 (2004) ("Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. at 392 ("Courts must give great deference to agency procurement

decisions and will not lightly overturn them." (citing Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985))).

Similarly, in E.W. Bliss Co. v. United States, the United States Court of Appeals for the Federal Circuit offered guidance on the applicable standard of review:

> Procurement officials have substantial discretion to determine which proposal represents the best value for the government. See Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d 955, 958 (Fed. Cir. 1993); cf. Widnall v. B3H, 75 F.3d 1577 (Fed. Cir. 1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason . . . even if the Board itself might have chosen a different bidder"); In re General Offshore Corp., B-251969.5, B-251969.6, 94-1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3 (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted).
>
> * * *
>
> Bliss' [other challenges to the procurement] deal with the minutiae of the procurement process in such matters as technical ratings . . . which involve discretionary determinations of procurement officials that a court will not second guess. See Lockheed Missiles & Space Co., 4 F.3d at 958; Grumman Data Systems Corp. v. Widnall, 15 F.3d 1044, 1048 (Fed. Cir. 1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement.") . . . .

E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); see also Galen Med. Assocs. v. United States, 74 Fed. Cl. 377, 383-84 (2006); JWK Int'l Corp. v. United States, 49 Fed. Cl. 371, 388 (2001), aff'd, 279 F.3d 985 (Fed. Cir.), reh'g denied (Fed. Cir. 2002).

The Federal Circuit also has stated:

> Effective contracting demands broad discretion. Burroughs Corp. v. United States, 617 F.2d 590, 598 (Ct. Cl. 1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the

> Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.
> . . .

Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d at 958-59; see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330; Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995; Grumman Data Sys. Corp. v. Widnall, 15 F.3d at 1046; PHT Supply Corp. v. United States, 71 Fed. Cl. 1, 11 (2006).

Barring arbitrary and capricious behavior or a violation of law, the wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals. See Compubahn, Inc. v. United States, 33 Fed. Cl. 677, 682-83 (1995) ("[T]his court is in no position to challenge the technical merit of any comments made on the evaluation sheets or decisions made during the several stages of evaluation.") (footnote omitted)); see also Textron, Inc. v. United States, 74 Fed. Cl. at 286 (in which the court considered technical ranking decisions "minutiae of the procurement process" not to be second guessed by a court) (quoting E.W. Bliss Co. v. United States, 77 F.3d at 449). The question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but, rather, whether the conclusions reached by the agency lacked a reasonable basis and, therefore, were arbitrary or capricious, in which case, courts have a role to review and instruct.

To prevail in a bid protest case, the protester not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"). Recognizing the two-step analysis of bid protest cases, the Federal Circuit has stated that:

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351. In describing the prejudice requirement, the United States Court of Appeals for the Federal Circuit has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a

> substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'") (citation omitted).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999) (citation omitted in original); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1331; Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In Data General Corporation v. Johnson, the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract . . . . The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.
>
> This is a refinement and clarification of the "substantial chance" language of CACI, Inc. Fed., 719 F.2d [1567,] 1574 [(Fed. Cir. 1983)].

Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir.), reh'g denied, en banc suggestion declined (1996); see also Bannum, Inc. v. United States, 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum. . . . To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process. (quoting Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; Statistica, Inc. v. Christopher, 102 F.3d at 1581; and Data Gen. Corp. v. Johnson, 78 F.3d at 1562)); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1331 ("To establish prejudice, the claimant must show that there was a 'substantial chance it would have received the contract award but for that error.'" (quoting Statistica, Inc. v. Christopher, 102 F.3d at 1582); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d at 1370 (using the "substantial chance" standard); OMV Med., Inc. v.

United States, 219 F.3d at 1342 (invoking a "reasonable likelihood" of being awarded the contract test); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057 (using a "reasonable likelihood" rule); Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1380 (using a "substantial chance" test); Info. Scis. Corp. v. United States, 73 Fed. Cl. at 96 (using a "substantial chance" test), recons. in part, 75 Fed. Cl. 406, 412 (using a "substantial chance" test) (2007); Park Tower Mgmt., Ltd. v. United States, 67 Fed. Cl. 548, 559 (2005) (using a "substantial chance" test). Plaintiff raises the following challenges to the selection of MTCI for award.

Untimely MTCI Proposal

Plaintiff argues that proposals were due by 10:00 a.m. EST on February 8, 2008, and that it made the deadline, but that MTCI's proposal was received late, on February 12, 2008, and should not have been considered by the agency. As is more fully addressed below, the record contains a declaration of the contracting officer discussing how she extended the deadline on the web site, and an e-mail, dated February 7, 2008, the day before proposals originally were due, sent by the agency contracting officer to all offerors, including the plaintiff, extending the closing date for receiving proposals to February 12, 2008, 3:00 p.m. EST. Plaintiff does not contest that it received the e-mail. Under this extension, MTCI's proposal was timely and plaintiff was not prejudiced.

The Government Accountability Office (GAO) issued an advisory opinion on June 27, 2008, at the court's request,[4] based on a bid protest filed by CTC with the GAO, which raised with the GAO, among other issues, the alleged untimeliness of the MTCI proposal. The GAO advisory opinion concluded that the above-cited e-mail from the contracting officer to the offerors rendered MTCI's proposal timely, concluding that, "in light of the fact that all firms received the e-mail, it served to effectively amend the RFP. " Career Training Concepts, Inc., B-311429; B-311429.2, June 27, 2008, slip op. at 2 n.2 (citing Phenix Research Prods., B-292184.2, 2003 CPD ¶ 151, at 5, 2003 WL 21956013, at *4 (Comp. Gen. Aug. 8, 2003)).

Plaintiff nevertheless argues that the e-mail was ineffective because it was merely an e-mail, not a formal solicitation amendment, citing to a previous opinion issued by the undersigned judge, Conscoop-Consorzia Fra Cooperative Di Prod. E Lavoro v. United States, 62 Fed. Cl. 219 (2004), aff'd, 159 F. App'x 184 (Fed. Cir. 2005). However, Conscoop is distinguishable from the present case. In Conscoop, there was a conflict between when proposals were due according to an agency web site and according to the solicitation, which was accessed through the agency web site. The web site stated that proposals were due at 2:00 p.m., U.S. Time Zones, and the solicitation stated proposals

[4] The GAO had dismissed CTC's protest on June 18, 2008, based on the filing of the June 18, 2008 complaint by CTC in this court. Representations to the court were made, however, that the GAO was about ready to issue its opinion. Therefore, the court requested the GAO to do so, and the GAO issued its opinion only five work days later.

were due 2:00 p.m., Naples, Italy time. Id. at 229-30. As to this time conflict between web site and electronic solicitation, the court gave the nod to the solicitation. Id. at 229. In the present case, however, rather than a conflict between competing times or sources of information for when proposals were due, in the instant case, the agency posted the solicitation on the GSA e-Buy website, then extended the proposal deadline on the same GSA e-Buy website in advance of the due date.

After the initial hearing in plaintiff's request for injunctive relief, and after the administrative record was filed, the government filed a July 31, 2008 motion for leave to supplement the administrative record with a sworn declaration from Captain Theresa M. Glasgow, the agency contracting officer, clarifying the import of documents in the record which purported to amend the solicitation. In the same motion, the government also sought to supplement the record with the agency report filed by the agency at the GAO pursuant to CTC's earlier GAO protest. In an August 1, 2008 filing, plaintiff objected to supplementation of the record, arguing that the record was closed. The normal rule is that judicial review of agency action is confined to the administrative record, however, among the exceptions to the general rule is "when agency action is not adequately explained in the record before the court . . . ." Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989) (footnote omitted).

The court finds Captain Glasgow's declaration useful in explaining the filed administrative record, in particular Tabs 5, 12, 13, and 16, and the discussion during oral argument on July 25, 2008, concerning the agency's use of the GSA e-Buy system. After review of defendant's motion and plaintiff's objections, the court grants defendant's motion to supplement the record with Captain Glasgow's declaration as Tab 72 in the record. With respect to defendant's request to include the agency report to the GAO in the administrative record, a document clearly identifiable prior to the filing of this lawsuit, defendant, and for that matter also the plaintiff, chose not to request to include the document when the administrative record was assembled. Moreover, the agency has filed extensive responses to the issues before this court, including on any overlapping issues with the GAO protest. Therefore, defendant's motion to supplement the record with the agency's report to the GAO is denied. In plaintiff's August 1, 2008 response, CTC requests that the record be supplemented with two GSA e-Buy website related documents attached to plaintiff's August 1, 2008 filing. The court grants plaintiff's request, with the documents designated as Tab 73 in the record.

With regard to supplementation of the record, plaintiff also noted in its filing that it was denied the opportunity at the oral argument on July 28, 2008 to supplement the record and offer arguments not included in its filings and not shared with the defendant prior to the oral argument, on the issue of organizational conflict of interest and MTCI's disqualification. Defendant strenuously objected to having such new information introduced for the first time at oral argument. Plaintiff once again requested to be able to offer the arguments and supplement the record if defendant's motion to supplement the record were to be granted. After denying plaintiff's motion for a temporary restraining order and preliminary injunctive relief on the disqualification issue, based on an absence of likelihood of success on the

merits on the disqualification issue, the court, nonetheless, afforded the plaintiff the opportunity to supplement the record and to make additional arguments on the disqualification issue as part of a request for permanent injunctive relief. In an August 15, 2008 filing with the court, however, plaintiff's counsel, after consulting with his client, advised that CTC would not proceed with the disqualification issue and withdrew plaintiff's request for a permanent injunction.

Turning to the merits, Captain Glasgow explains in her sworn declaration that the original solicitation was posted on the GSA e-Buy website, and that e-Buy is an electronic Request for Quotation (RFQ) system.[5] The e-Buy system permits federal buyers to prepare solicitations for goods and services offered through GSA's Multiple Award Schedule Program. Captain Glasgow continues:

> When I posted Modification 1 to the solicitation, which indicated that the date for receipt of proposals has been extended, I simultaneously changed the date on the appropriate clock of the GSA EBuy listing to 12 February 2008. There was no need to repeat it in the narrative of the modification since it automatically changed the date as indicated on the screenshot of the RFQ printed out on 5 May 2008. As stated before, I could not have changed the closing date of 12 February 2008 on the listing if this was not an active RFQ because the system will not let you make retroactive changes after the closing date. Taken together, the posted modification and the change in the date on the listing page amended the solicitation. Courtesy email copies were sent to the vendors who submitted questions (Mind and Media and MTCI) letting them know about the new posting to the website. I also courtesy copied CTC since they are the subcontractors under the current contract.

The record reflects that Captain Glasgow placed the solicitation on the GSA e-Buy system on January 25, 2008, with an original closing date of February 8, 2008. Modification 1 to the solicitation was placed on the GSA e-Buy system on February 7, 2008, and indicated in the narrative of the modification that one of the purposes of the modification was to extend the closing date of the solicitation. The record also contains a copy of the GSA e-Buy website screen which reflects the extension of the date for proposals to February 12, 2008, 3:00 p.m. EST. The e-mail notices of the proposal extension date to February 12, 2008, sent to Mind & Media, CTC and MTCI were not designed to be a formal amendment of the solicitation, but additional, courtesy notices sent to the offerors. CTC agrees that it received a copy of the notice. All offerors, including CTC, had access to the website. The exhibits submitted by the plaintiff reflect that

[5] The Federal Acquisition Regulation (FAR) explains: "(d) *e-Buy,* GSA's electronic Request for Quotation (RFQ) system, is a part of a suite of on-line tools which complement GSA Advantage!. E-Buy allows ordering activities to post requirements, obtain quotes, and issue orders electronically." 48 C.F.R. § 8.402(d) (2007).

modifications, such as the one executed by Captain Glasgow, are made on the GSA e-Buy system. New administrative record tab 73 notes that federal buyers, such as the Army National Guard Bureau "Forward RFQ/RFPs to others for review and purchase," that contractors have "Access to all RFQ/RFPs," and that federal buyers "Submit on-line Modifications" on e-Buy. The materials submitted by plaintiff, now at tab 73 in the record, also state that: "At any time, while the RFQ is 'Open,' the buyer may modify the contents of the RFQ." This can be done by selecting "Modify RFQ." The plaintiff's exhibit now at tab 73 of the record contains the "Modify RFQ" block on the GSA e-Buy website. Even without the information offered in new exhibits 72 and 73, at oral argument, the defendant offered similar explanations of the website activity using documents already in the record. The court concludes that the proposal deadline was properly extended, that MTCI's proposal was timely and that CTC was not prejudiced, having equal access to the manner in which the modification and notice were communicated.

FAR Subpart 8.4 (Federal Supply Schedules) versus FAR Part 15 (Contracting by Negotiation

The solicitation states that "[t]his will be a GSA Schedule award." Nevertheless, there was some indicia of non-GSA Federal Supply Schedules award language during the acquisition process, which will be addressed below on the issue of whether or not discussions were required to be held and whether discussions were held.

I. FAR 8.4 and Federal Supply Schedules Education Liaison Labor Category

Plaintiff argues that if it is assumed that FAR 8.4 applies, which is the government's position, then MTCI is ineligible for award of the contract at issue because MTCI did not possess the required Education Liaison labor category in the Federal Supply Schedules (FSS). By way of support, CTC cites to the government's own evaluation of MTCI's price proposal, which states that: "The Education Liaison (EL) labor category is a unique labor category and not on the offeror's MOBIS [Mission Oriented Business Integrated Services] contract."

The government acknowledges that the phrase "Education Liaison" is not found on MTCI's Federal Supply Schedules price list. The agency contracting officer, however, reviewed the description of related job categories which are listed on MTCI's Federal Supply Schedules and found similar functions to the function required of an Education Liaison. The solicitation indicates that the Education Liaison promotes a positive image of the military and enhances recruiting efforts at schools. In describing examples of the type of personnel the military is looking for to perform Education Liaison duties, the solicitation specifically mentions retired military instructors and retired military recruiters. The government cites to descriptions of the following related labor categories on MTCI's Federal

Supply Schedules: Chief Instructor, Assistant Chief Instructor, Instructor/Training Developer, Senior Instructor, and Senior Recruiter.[6]

CTC criticizes the government's comparison of related labor categories, arguing that, in addition to the functions identified by the contracting officer in the above-cited MTCI labor categories (Senior Recruiter, etc.), the Education Liaison must "get recruiters in front of students by dealing with schools and educators in an attempt to convince them to allow recruiters into the schools."

The description of Senior Recruiter in MTCI's Federal Supply Schedules states:

> Plans, coordinates and executes recruiting activities to provide labor support for various organizations including the military. Has strong familiarity with client's organizational mission, eligibility requirements, and personal attribute requirements. Develops prospecting strategies, conducts interviews, assists candidates with the application process and develops demographic studies and market analysis.

"Plans, coordinates and executes recruiting activities" and "[d]evelops prospecting strategies" for organizations including the military, in the court's view, would include obtaining access to and getting in front of potential recruits. CTC has cited to no prohibitions on the government's common sense identification of overlapping, related labor categories to meet the Education Liaison function. See Data Mgmt. Servs. Joint Venture v. United States, 78 Fed. Cl. 366, 377-78 (2007) (finding that personnel in a related FSS labor category "would be in a position" to perform the work of the labor category in the solicitation, that the related labor category is "consistent with the function" of the requested labor category, and that the related labor category is "within the scope" of the requested labor category).

The court notes that the evaluation of CTC's price proposal contained the same comment found on MTCI's price proposal: "The Education Liaison (EL) labor category is a unique labor category and not on the offeror's MOBIS contract." CTC's Federal Supply Schedules did not contain the exact words, "Education Liaison" either, but did contain a labor category titled "EDUconnect™ Program," the description of which included educational outreach; training for military recruiters, school administrators and faculty; promoting a positive image of the military within the community; developing relationships within the school community; using school programs; and presentation skills and sales strategies. The agency found that both MTCI and CTC had labor categories with descriptions sufficiently close to the Education Liaison labor category to be compliant with the solicitation. The court finds CTC's challenge to MTCI's Federal Supply Schedules labor

---

[6] In its response to CTC's motion for partial reconsideration, addressed below, the government focused on MTCI's related labor categories of Instructor/Training Developer, Instructional Technologist, and Senior Recruiter.

category to be without merit, and so advised the parties at the court's bench ruling on August 6, 2008.

Later that same day, on August 6, 2008, CTC filed a motion for partial reconsideration focusing on the FSS labor category issue. The government previously had stipulated that CTC possessed the requisite labor category. During the bench ruling, CTC incorrectly believed that the court had concluded otherwise, that neither CTC nor MTCI had the necessary labor category. The court was referring to the fact that the agency initially had concluded for both CTC and MTCI, as noted above, that: "The Education Liaison (EL) labor category is a unique labor category and not on the offeror's MOBIS contract." However, also as noted above, the agency did not stop there, but reviewed related labor categories for both CTC and MTCI, and concluded for both offerors that there were related labor categories which adequately described the functions of an Education Liaison. In response to CTC's motion for partial reconsideration, the government explained: "the Contracting Officer found that both CTC and MTCI provided a combination of services that were 'responsive to the Government's objectives' and, therefore, equivalent to an 'educational liaison' even though neither CTC nor MTCI had a 'unique' labor category with that particular name." CTC's motion for partial reconsideration on this issue is denied.

II. FAR 15 and the Need for Discussions

CTC charges that the agency was required to conduct meaningful discussions with CTC, and did not do so. CTC's reasoning is that the procurement was actually subject to FAR Part 15, "Contracting by Negotiation," rather than FAR Subpart 8.4 "Federal Supply Schedules," for several reasons. Plaintiff points out that the RFP box on the solicitation cover page was checked; the solicitation used words like "proposals," "evaluation of proposals," "competitive range" and "best value"; the agency used vendor responses and the source selection decision document referred to FAR Part 15. The source selection document stated:

> In summary, based on my integrated assessment of all the proposals and evaluations in accordance with the solicitation, it is my decision that MTCI is responsible, offers the best value to the Government, and is selected for contract award. Making this award meets the requirements of FAR Part 15 and acquires the best value for the Government.

The agency also debriefed CTC after award to MTCI, citing FAR 15.506 for the contents of the debriefing.

The above terms and concepts are found in a FAR Part 15 negotiated procurement, but CTC has not provided the court with authority for the proposition that it is forbidden for a contracting officer to borrow appropriate ideas and terms from alternative contracting methods in furtherance of a given procurement. At oral argument, defendant's counsel pointed out that FAR 8.404(a) states that FAR Part 15 does not apply to "orders placed against Federal Supply Schedules contracts . . . ." 48 C.F.R. § 8.404(a) (2007). The court

in Ellsworth Associates noted generally that: "The decisional law does not support plaintiff's contention that an FSS selection process that is handled more like a negotiated procurement must comply with the requirements of Part 15." Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. at 394 (footnote omitted); see also Cybertech Group, Inc. v. United States, 48 Fed. Cl. 638, 648 (2001). The Ellsworth court also stated that a protester in an FSS procurement "must rely on establishing that the government officials involved in the procurement process were without a rational and reasonable basis for their decision." Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. at 396; see also Labat-Anderson Inc. v. United States, 50 Fed. Cl. at 104-05. In Intelligent Decisions, Inc., the agency obtained six quotes on a RFQ, best value, GSA schedule procurement. Intelligent Decisions, Inc., B-274626, B-274626.2, 97-1 CPD ¶ 19, 1996 WL 756871, at *2 (Comp. Gen. Dec. 23, 1996) (cited in Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. at 395), recons. denied, B-274626, B-274626.3, 97-1 CPD ¶ 185, 1997 WL 253152 (Comp. Gen. May 15, 1997). The agency in Intelligent Decisions, Inc. conducted discussions with one of the vendors, and permitted that offeror to revise its price and technical solution based on the discussions. Id. The protester argued, among other things, that it was a FAR Part 15 negotiated procurement, and that vendors were treated unequally and unfairly. Id. at *3. The GAO nevertheless concluded it was an FSS buy, and because it was, the GAO permitted discussions with the single vendor and resulting price revision. Id. at *4. The leeway generally given agencies in FSS procurements in these cases does not support plaintiff's argument.

Nevertheless, in the alternative, if FAR Part 15 were applicable, then CTC points to FAR 15.306(a)(3), which only authorizes an award without discussions if the solicitation first gives offerors notice that award may be made without discussions, which this solicitation did not do. CTC also notes that in a FAR Subpart 8.4 procurement "discussions are not normally necessary unless the solicitation so states." CTC objects to what plaintiff alleges occurred: that discussions were required, and were actually held, but were not meaningful, that is, did not give notice to CTC of all significant weaknesses and an opportunity to correct deficiencies in order to enhance chances for award. CTC argues that the remedy for this government error is to set aside the award to MTCI. CTC continues: "To be clear, what happened here, in substance, is that the Army allowed CTC an opportunity to revise part of its proposal without advising it of all of the significant weaknesses and/or deficiencies in its proposal. As set forth above, this constitutes 'discussions,' whether labeled 'clarifications' or not."

The government responds by asserting that what occurred with CTC and its proposal were clarifications, not discussions. The GAO's advisory opinion on the CTC protest agreed with the government:

> As a general rule, in a negotiated procurement, agencies properly may make award without engaging in discussions, provided the RFP states that this is the agency's intent. However, where a procurement is an FSS purchase conducted pursuant to FAR part 8.4, as was the case here, an agency properly may make award without conducting discussions, even if

> the solicitation does not expressly advise vendors of that possibility. We conclude that the agency was under no obligation to engage in discussions.
>
> CTS [sic] maintains that, whether or not the agency was required to do so, it in fact initiated discussions with CTC, and that those discussions were not meaningful because they were not comprehensive. Once an agency initiates discussions, those discussions must be meaningful. In order for discussions to be meaningful, the agency must advise offerors of deficiencies in their proposals and afford them an opportunity to revise their proposals to satisfy the government's requirements. See FAR §§ 15.610(c)(2), (5).
>
> The premise of CTC's argument – that the agency initiated discussions with CTC – is incorrect. While the agency communicated with CTC, its communication constituted clarifications rather than discussions. In this regard, a clarification is a limited exchange intended to clarify aspects of a vendor's proposal or to resolve minor or clerical mistakes. See FAR § 15.306(a). Discussions, in contrast, provide a firm the opportunity to make substantive revisions to its proposal. Here, the agency sent CTC two requests seeking a narrative description of the components included in CTC's price for [deleted], and a narrative rationale for its [deleted]. In response, CTC provided the agency the requested narratives. We think it is clear that the requests were intended to facilitate the agency's understanding of the underlying cost components included in CTC's price proposal, but did not provide CTC an opportunity to submit a revised price. Such a clarification request does not trigger the obligation to initiate discussions, since CTC's responses clarified, but did not modify, its proposal.

Career Training Concepts, Inc., B-311429; B-311429.2, June 27, 2008, slip op. at 6 (other citations omitted).

In Computer Sciences Corporation, relied on by both parties, the RFP informed offerors that the agency intended to make award without discussions. Computer Scis. Corp., et al., B-298494.2, et al., 2007 CPD ¶ 103, 2007 WL 1732285, at *4 (Comp. Gen. May 10, 2007). Summarizing the rules, the Computer Sciences Corporation GAO decision stated:

> FAR sect. 15.306 describes a range of exchanges that may take place between an agency and an offeror during negotiated procurements. Clarifications are "limited exchanges" between the agency and offerors that may allow offerors to clarify certain aspects of proposals or to resolve minor or clerical mistakes. FAR sect. 15.306(a)(2). Discussions, on the other hand, occur when an agency indicates to an offeror significant weaknesses,

> deficiencies, and other aspects of its proposal that could be altered or explained to materially enhance the proposal's potential for award or to obtain information from the offeror that is necessary to determine the proposal's acceptability. See FAR sect. 15.306(d)(3). When an agency conducts discussions with one offeror, it must conduct discussions with all other offerors in the competitive range, FAR sect. 15.306(d)(1), and those discussions must be meaningful; that is, the discussions must identify deficiencies and significant weaknesses in each offeror's proposal. FAR sect. 15.306(d)(3). It is the actions of the parties that determine whether discussions have been held and not merely the characterization of the exchanges by the agency. In this regard, we have found that the acid test for deciding whether an agency has engaged in discussions is whether the agency has provided an opportunity for proposals to be revised or modified.

Computer Scis. Corp., 2007 WL 1732285, at *7 (other citations omitted). In Computer Sciences Corporation, the GAO found that the agency had conducted discussions with the offerors rather than clarifications, because the agency's exchanges with the offerors allowed them "to revise their proposals in a material way." Id. at *10.

In this regard, the record contains the government's request to CTC, dated February 28, 2008, titled "Clarification Request":

> a) The offeror proposed an escalation rate of [deleted]. Please clarify the rationale used by the offeror to arrive at this.
>
> b) The offeror only provided a total price for [deleted]. Please clarify the basis of estimate or an itemized breakdown of the total price.

CTC's response to the agency's request was titled "ELP [Education Liaison Program] Price Proposal Clarification." Moreover, CTC did not object when the agency characterized the exercise as clarifications, and CTC itself contemporaneously characterized its input to the agency as clarifications. Nonetheless, in this current litigation CTC argues that the requested information constituted discussions. CTC's response to the first question, in essence, was that the escalation rate was based on previous increases in federal pay tables. CTC's response to the second question, in essence, was that [deleted] costs were based on average, annual historical [deleted] costs. After reviewing this exchange between the agency and CTC, the court concludes that CTC's proposal was not revised in a material way and that what occurred were clarifications not discussions. For that matter, CTC acknowledged during oral argument that the interchange between the agency and MTCI, as well as MTCI's submission of additional materials in response to the agency, also did not rise to the level of discussions. The court asked CTC's counsel whether clarifications or discussions were conducted with MTCI. CTC's counsel responded that: "They [MTCI] were asked questions. I don't think they rose to the level of discussions there." CTC apparently believes that it was given an opportunity to materially revise its

proposal, while MTCI was only given the opportunity to clarify its proposal, and that any additional opportunity the agency afforded CTC may be employed to undo a competition it did not win. The record does not support CTC's view of the exchanges. The court concludes that the agency conduct as to its exchanges with CTC was reasonable under the circumstances.

Evaluation

The solicitation stated that the procurement was a best value procurement, and that the Technical and Management evaluation factor was more important than Past Performance, and Past Performance was more important than price. Price was the least important factor, but was be evaluated in the best value analysis. Both CTC and MTCI were rated [deleted] for the Past Performance factor, and CTC had a lower price than MTCI, such that CTC believes that the award went to MTCI primarily because of the Technical and Management factor evaluation. In this protest, CTC, therefore, identifies Technical and Management subfactors in which it was assigned a weakness.

I. Recruiting Presentations

CTC was assigned a "major weakness" on the requirement to conduct, at a minimum, two recruiting presentations per week, while MTCI was given a "strength" in the same subfactor. In its proposal, CTC, as an incumbent subcontractor, stated the number of presentations made while an incumbent contractor, rather than indicate how it intended in the future to meet the solicitation's standard of six presentations per month. The agency evaluation concluded that CTC's input did not meet the minimum number of presentations required for this solicitation. CTC's response to the evaluation is that the solicitation itself provided that, if the offeror does not indicate reservations, it would be assumed that the offeror agrees to meet requirements, for which, according to plaintiff, no weakness should be assigned. CTC also believes MTCI did not sign up to the requirements either, but the court notes that the same solicitation "assumption" provision on which CTC relies would operate in favor of MTCI regarding whether or not MTCI signed up to the requirement.

The solicitation requirement was for a stated minimum of recruiting presentations per week, and all CTC's argument achieves is an assumption that CTC will provide the minimum. MTCI, on the other hand, received a strength by indicating that, depending on the situation and the location, more presentations than the minimum may be necessary. In the words of defendant's counsel, MTCI "had an awareness of what was required out there in the world in which this contract was being performed." CTC characterizes what the agency thought was a strength, this intention to tailor the number of presentations to the varying needs in different communities, as an exception or reservation to the solicitation requirements. However, the agency's view that MTCI's posture on this subfactor was positive, involving more presentations in areas where appropriate, was not unreasonable. Although CTC would have evaluated CTC and MTCI differently, CTC has not demonstrated that the evaluation of this subfactor by the agency was unreasonable, or that "assuming"

CTC would meet the very basic requirements and no more would have had a material impact and changed the result of the competition.

II. Hiring Personnel

CTC objects to the weakness it received in this subfactor, and the strength received by MTCI in the same subfactor. The agency evaluation was concerned about CTC's plan for vetting its personnel. CTC, as an incumbent subcontractor, reported that [deleted]. MTCI, for its part, indicated that all employees would undergo a thorough background check, and that MTCI would give priority to re-interviewing personnel, including incumbent CTC personnel hired by MTCI. The court detects a difference in the words and the tone of these two proposal submissions, as did the agency evaluators. The court should not stand in the shoes of the evaluators and substitute its judgment as to the importance of this distinction between the two offerors' proposals. See U.S. Postal Serv. v. United States, 534 U.S. at 7 (citing Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U.S. at 43); Co-Steel Raritan, Inc. v. ITC, 357 F.3d at 1309 ("'The court is not empowered to substitute its judgment for that of the agency.'" (quoting Tex. Crushed Stone Co. v. United States, 35 F.3d 1535,1540 (Fed. Cir. 1994) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 416))). The court finds a reasonable basis for the agency's evaluation of this subfactor.

III. Considering Extra-Proposal Information

Another CTC objection centers on Sergeant First Class Lloyd J. Bowers, who CTC describes as both the Contracting Officer's Representative on the incumbent contract in which CTC was a subcontractor, and one of the evaluators on the procurement at issue. CTC complains that solicitation language forbade Sergeant First Class Bowers from considering extra-proposal information. The solicitation stated:

> Offerors shall assume that the Government has no prior knowledge of the company's capability and experience. The Government evaluates proposals based upon the information that the offeror presented in his or her proposal. However, the Government may verify proposal information, as necessary, and may use data obtained from other sources in the evaluation.

CTC challenges this solicitation language as contrary to case law, and cites by way of support not binding decisions on this court, but GAO decisions. Although not binding on this court, GAO opinions are properly used for information and guidance, given the GAO's experience and expertise. More to the instant point, however, the same GAO addressed this very issue in the advisory opinion issued in the protest CTC filed with the GAO. Since CTC relies on GAO rules and GAO cases, we can let the GAO speak for itself:

> We also conclude that the agency was under no obligation to consider extraneous information relating to CTC's performance under its predecessor contract in its evaluation of CTC's technical/management proposal. In this

> regard, a vendor is responsible for preparing an adequately written proposal, and it is the substance of the proposal – rather than any extraneous information – that establishes the vendor's understanding of the terms of the RFP. We have recognized a limited exception that requires agencies to give consideration to extraneous information that is "simply too close at hand" in connection with the evaluation of a firm's past performance. Similarly, where a solicitation's technical evaluation criteria encompass traditional responsibility considerations, we have found it unobjectionable for agencies, for example, to give consideration to extraneous information obtained in connection with a responsibility determination in assessing the firm's technical proposal. Here, CTC's objections relate only to the agency's evaluation of its technical/management proposal – as opposed to its past performance proposal – and nothing in the solicitation's description of the technical/management evaluation factor related to traditional responsibility considerations. Under these circumstances, the agency was not required to give consideration to extraneous information relating to CTC's performance of its predecessor contract; in the final analysis, CTC failed in its obligation to adequately address in it technical proposal its technical approach to meeting the solicitation requirements.

Career Training Concepts, Inc., B-311429; B-311429.2, June 27, 2008, slip op. at 5 (citations, all GAO decisions, omitted). CTC had the benefit of this opinion from the GAO, but did not address the GAO's view of its own rule and its own cases as applied to CTC's very own case.

The court finds no merit in CTC's objection. Furthermore, if CTC had an objection to the above-quoted solicitation provision prohibiting independent consideration of CTC's history beyond what is in the offer submitted, it should have brought the objection to the attention of the agency before proposals were received, evaluated and award made. A timely objection would have afforded the agency the opportunity to cure any defect. CTC's objection in this regard is not timely. It is not proper to permit a bidder to raise an objection on a patent aspect of the solicitation after the fact, if unsuccessful in the competition, but to remain silent on the objection if successful. In Blue & Gold Fleet, the United States Court of Appeals for the Federal Circuit stated that:

> We also hold that a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.
>
> * * *
>
> [W]here there is a "deficiency or problem in a solicitation . . . the proper procedure for the offeror to follow is not to wait to see if it is the successful offeror before deciding whether to challenge the procurement, but rather to raise the objection in a timely fashion." N.C. Div. Of Servs. for the Blind v. United States, 53 Fed. Cl. 147, 165 (2002). The reasons expressed by the

Court of Federal Claims mirror those underlying the patent ambiguity doctrine.

> It would be inefficient and costly to authorize this remedy after offerors and the agency had expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation. Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm.

Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 175 n.14 (2005).

Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313-14 (Fed. Cir. 2007) (other citations omitted); see also Infrastructure Def. Techs., LLC v. United States, 81 Fed. Cl. 375, 388-89 (2008). CTC's objection to the above solicitation language is not timely and without merit.

IV. Past Performance (Hiring)

CTC notes that it received a major weakness for past performance and that MTCI received a strength for the same area. The agency evaluators commented that: [deleted]. After a review of CTC's Tab B, the court concludes that of the four contract citations, one does address this area, albeit somewhat neutrally: [deleted]. In contrast, MTCI's Tab B on past performance contained a contract citation which supports the following evaluator comment: [deleted].

In any event, of all the past performance ratings, Neutral, High Risk, Moderate Risk, and Low Risk, both CTC and MTCI received the [deleted] rating for past performance – [deleted]. Not only do the evaluation comments singled out by CTC appear to be reasonable in light of the proposals, but CTC, with the same top score in this area as MTCI, has not demonstrated prejudice.

V. Deliverables

At oral argument CTC noted that for the subfactor Deliverables, "there's really no difference in language between CTC's and MTCI's [proposals]. MTCI says a little more, but when you look at the substance of what's being said, there's nothing else really there." The agency evaluators agreed with CTC's counsel, that neither offeror did well in reflecting deliverables, and both offerors received a significant weakness as a result.

CTC nevertheless continues its argument, citing a strength MTCI received under the Deliverables subfactor, for providing "in depth details of each report, such as the Weekly School Activity Reports and the NGB School Program Report. The offeror describes the

report's purpose, contents, and use, which is significant." CTC argues that this MTCI strength resulted because the agency evaluators "went out and searched in other sections of the proposal for MTCI but didn't do that for us. And the bottom line issue is, while the agency is allowed to exercise discretion, there's got to be some degree of uniformity there." First, a review of MTCI's proposal reflects that assigning a strength in this area was reasonable and justified. Second, the court attempted to identify a similar section in CTC's proposal, but was unable to do so. CTC did not assist by providing a citation to the administrative record for language that indicates CTC also should have received a similar strength in Deliverables; there appears to be none. This assignment of error does not assist CTC.

VI. Retention of Personnel

CTC argues that it was evaluated on retention of personnel, and MTCI was not. The court disagrees. Under the Technical and Management evaluation factor there was a subfactor titled Maintain Staff, the description of which included a "reasonable approach to recruit[ing], train[ing], equip[ping], retain[ing], and deploy[ing] the required level of staffing in timely manner." CTC received a strength in this area for proposing a retention bonus, monthly awards program, and initial, sustainment and field training, among other things. MTCI received a strength in this same area for its orientation and training agenda, follow-up training, new hire training, sustainment training, and training support for program operations. In addition, there is a related subfactor titled Incentives, the description of which included an "effective/reasonable incentive policy to attract, motivate, and retain qualified representative[s]." CTC received a strength for this area. MTCI also received a strength for Incentives, with the agency evaluators noting a "monetary reward-based incentive to perspective [sic] ELPs [Education Liaison Program personnel] based upon their civilian education and experience." In addition, MTCI's proposal contains salaries commensurate with experience and education, a competitive salary range based on the local cost of living, and "[b]enefits such as matching 401(k), health reimbursement, dental insurance, group life insurance, accidental death coverage, [deleted] days of annual leave, [deleted] federal holidays, and [deleted] sick days . . . ."

Essentially, CTC is arguing that it proposed greater benefits than MTCI did, so it would do a better job at retaining personnel. Nevertheless, given the benefits MTCI proposed, it is not accurate to say that MTCI's proposal did not address retention of personnel, or was not evaluated for retention, along with the other descriptive items that made up the Maintain Staff and Incentives subfactors.

The court does not sustain CTC's challenge to the agency evaluation in this area or the other evaluation areas addressed above. The court finds the agency's evaluation to have been reasonable. Nor did CTC convincingly tie its miscellaneous objections to deficient ratings. CTC has not demonstrated prejudice. See Bannum, Inc. v. United States, 404 F.3d at 1351 ("A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the

government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.").

Disqualification

CTC argues that MTCI should be disqualified because MTCI used CTC's proprietary data in its Education Liaison Program proposal, or because of the appearance of impropriety stemming from MTCI's possession of CTC's proprietary data. The court acknowledges that, if substantiated, this can be a serious charge, but concluded in its August 6, 2008 bench ruling that CTC does not have a likelihood of success on the merits on this issue. The court originally deferred the final decision on a permanent injunction on this issue, and afforded CTC the opportunity for further briefing. On August 15, 2008, however, CTC advised the court that it would not proceed further on the disqualification issue and its request for a permanent injunction.

By way of support of its allegations, CTC charges that [deleted] was an MTCI employee as well as an Education Support Specialist for the Texas Army National Guard; that [deleted] attended a CTC training course from July 31 to August 3, 2006, where [deleted] received CTC proprietary information pertinent to the procurement in question; that [deleted] "developed MTCI's proposal for the subject procurement"; and that "CTC's proprietary information was improperly used to benefit MTCI in developing its proposal." CTC raises the Procurement Integrity Act, 41 U.S.C. § 423 (2000) and FAR implementation at FAR Subpart 3.1 (2007); the Trade Secrets Act, 18 U.S.C. § 1905 (2000); and organizational conflict of interest provisions at FAR Subpart 9.5 (2007).

[deleted] worked for MTCI from April 2006 to June 2008. [deleted], therefore, was an MTCI employee in 2006, when the training conference was held, and was working as a government contractor, filling a position as an Education Support Specialist for the Texas Army National Guard. [deleted] stated in [deleted] sworn declaration that [deleted], the President and founder of CTC, was aware that [deleted] was attending the training conference, that [deleted] spoke with [deleted] at the conference, that [deleted] was aware [deleted] was an MTCI employee, and that there were others like [deleted] in attendance. [deleted] also stated in her declaration that CTC's Educational Programs Director, who worked on the training conference, also was aware that [deleted] was working for MTCI. [deleted] added that [deleted] "had no role in shaping the Army's approach to the procurement at issue in this case," and that [deleted] "did not use any of the materials that CTC provided for the proposal that was submitted by MTCI for the contract at issue in this case."

Sergeant First Class (SFC) Lloyd J. Bowers submitted for the record a sworn declaration stating that he personally drafted the statement of work for the Education Liaison Program procurement, without any communication with MTCI employees, including [deleted]. SFC Bowers also stated that:

> I was informed by the Contracting Officer, Captain Glasgow, that CTC had made allegations that MTCI had improperly used CTC's proprietary information in their proposal. I assisted the contracting officer in her side-by-side review of both of these proposals. After comparing these proposals, I have not been able to find any evidence that MTCI used any of CTC's information – proprietary or not. Furthermore, I have reviewed the training materials which were provided to [deleted], from the Stone Mountain, Georgia, Conference. After evaluating this information against MTCI's proposal, I have not found any evidence that MTCI used any of CTC's information in their proposal.

[deleted], CTC's President, also submitted a sworn declaration for the record in which he stated that:

> [deleted], as well as other non-CTC employees, did attend the aforementioned training event. However, all of those non-CTC employees, to include [deleted], attended the training event on behalf of the National Guard Bureau or their respective Army National Guard states, not on behalf of their respective private contractor employers. This was because this training event was designed specifically for use by DEOs [Directors of Educational Outreach] and ESSs [Education Support Specialists] in their capacities serving the National Guard Bureau. The event was conducted under a task order from the National Guard Bureau and certainly none of the training or information was intended for use by those individuals outside of their official capacities on behalf of the Guard. The National Guard Bureau represented to CTC that the information provided by CTC would only be utilized by the attending individuals specifically in their DEO and/or ESS capacity and not towards any other ends.

Notwithstanding the side-by-side comparison of CTC's and MTCI's proposals by SFC Bowers and Captain Glasgow, CTC believes that a comparison of the "language and/or voice utilized by [deleted] in e-mails" reveal that CTC's proprietary materials were used by MTCI in its proposal. CTC, by way of support for its conclusions, suggests a comparison of a page in the record from MTCI's proposal with an e-mail sent by [deleted] to a colleague, which also is in the record. However, there is no similar language between the two, only a reference that [deleted] has been "behind the scenes" with MTCI, and is the "Program Manager for the ELP [Education Liaison Program]." CTC's belief that this e-mail constitutes the "smoking gun," and reflects that [deleted] imported CTC's proprietary material into MTCI's proposal, appears to be based on speculation and suspicion. The court's review of the available training materials and MTCI's proposal leads to the same conclusions arrived at by SFC Bowers and Captain Glasgow, which supports [deleted] sworn statement that [deleted] did not use CTC's training materials in MTCI's proposal. This conclusion also is consistent with [deleted] sworn statement, that [deleted] was aware of people like [deleted] attending the training course, and expected them to only use CTC's

materials for their Army National Guard work. Plaintiff has not demonstrated that [deleted] used CTC's proprietary material in MTCI's proposal.

The GAO advisory opinion came to the same conclusion in CTC's earlier protest:

> Notwithstanding the agency's investigation, we make the following observation regarding this issue. Under the terms of a protective order issued by our Office, CTC was provided with the portion of MTCI's proposal that presumably would contain the allegedly misappropriated proprietary information. After reviewing that information, CTC did not point to portions of the proposal that allegedly were derived from its proprietary information; rather, it stated that this portion of the proposal merely "parroted back" the contents of the RFP. Since a mere parroting of RFP language, by definition, would not appear to include CTC's proprietary information, on this record there would appear to be no basis for us to find that MTCI improperly included CTC's information in its proposal.

Career Training Concepts, Inc., B-311429; B-311429.2, June 27, 2008, slip op. at 7 n.5 (citations omitted). Based on the record before the court, plaintiff has not carried its burden to prove that MTCI should be disqualified from the award of the contract.

## CONCLUSION

Based on the above discussion, plaintiff's motion for judgment upon the administrative record and request for injunctive relief are denied. Defendant's cross-motion for judgment upon the administrative record is granted. The clerk's office will enter judgment consistent with this opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**